UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STANISLAW STERLINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 00596 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THE CATHOLIC BISHOP OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stanislaw Sterlinski filed this suit against the Catholic Bishop of Chicago, alleging national origin discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*, as well as age discrimination and retaliation under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*[1] R. 1, Compl.[2] In particular, Sterlinski alleges that he was demoted from his position as a local parish's Director of Music because he is Polish and due to his age, and then was fired when he complained about the demotion. *Id.* (Count 1 ¶ 12; Count 2 ¶ 14; Count 3 ¶ 12; Count 5 ¶ 18).

Earlier in the case, the Court dismissed the initial complaint because the allegations themselves established that Sterlinski was a "minister" for purposes of

---

[1]This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331. The "ministerial exception" to federal employment laws is actually an affirmative defense as to the scope of those laws, rather than an exception to subject matter jurisdiction. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012).

[2]Citations to the record are noted as "R." followed by the docket number and, if necessary, the page or paragraph number.

the "ministerial exception"—that is, the exception to employment-discrimination laws dictated by the First Amendment's religion clauses. R. 23, 8/23/16 Opinion at 7-13. Sterlinski then filed an Amended Complaint, asserting all of the same claims, but this time alleging how the demotion affected his job duties as the church's Director of Music. R. 24, Am. Compl. (Count 1 ¶ 13). That is the only substantive difference between the original complaint and the amended one. The Catholic Bishop moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that the ministerial exception still barred the claims. R. 26, Mot. to Dismiss Am. Compl. The Court granted the Catholic Bishop's motion as it pertained to Sterlinski's claims arising from the *demotion*, but denied it as it pertained to his *firing*. R. 37, 05/01/17 Opinion at 8. Instead, the Court authorized limited discovery on the issue of whether Sterlinski was a "minister" within the meaning of the ministerial exception at the time of his firing. *Id.* at 10. After conducting discovery on that limited issue, the Catholic Bishop moved for summary judgment, R. 44, Def.'s Mot. Summ. J., and Sterlinski cross-moved, R. 56, Pl.'s Resp. and Cross-Mot. Summ. J. For the reasons stated below, summary judgment is granted to the Catholic Bishop. Sterlinski's cross-motion for summary judgment is denied.

## I. Background

The Catholic Bishop hired Sterlinski in July 1992 to serve as the Director of Music at St. Stanislaus Bishop and Martyr Parish. R. 57, PSOF ¶¶ 6-7.[3] In June

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Catholic Bishop's Statement of Facts [R. 43], "PSOF" for Sterlinski's Statement of Facts [R. 57], "Def.'s Resp. PSOF" for the Catholic Bishop's response to

2

2014,[4] Sterlinski was demoted from a full-time position to a part-time position without benefits. *Id.* ¶¶ 8, 10-11. As a result of the demotion, Sterlinski's duties as Director of Music were taken away: he no longer participated in the budget process; he was not sent to Archdiocesan Music Committee activities; his access to the church became limited; he became responsible for maintaining his own music skills; he no longer taught music to the children at Polish School; and he no longer held practices for the church choirs. *Id.* ¶¶ 13, 30. After the demotion, Sterlinski performed only the duties of organist at church functions. *Id.* ¶ 25; DSOF ¶ 6. And, even as the organist, he no longer had any discretion in picking what music to perform during Mass. PSOF ¶ 27. Instead, he played music selected by the Parish Pastor, Father Dziorek, in the traditional style and manner. *Id.* ¶¶ 26-27. Sterlinski followed the instructions of the sheet music when playing during Mass, without any changes or improvisation. *Id.* ¶¶ 26, 28-29. The parties disagree on whether Sterlinski's job title changed from Director of Music to Organist after his demotion. R. 57, Pl.'s Resp. DSOF ¶ 5. But neither party disputes that Sterlinski was not formally ordained. R. 59, Def.'s Resp. PSOF ¶ 20. Sometime after the demotion,[5] Sterlinski was fired. PSOF ¶ 14.

---

Sterlinski's Statement of Facts [R. 59], and "Pl.'s Resp. DSOF" for Sterlinski's response to the Catholic Bishop's Statement of Facts [R. 57].

[4]Sterlinski's Statement of Facts lists two different dates for the demotion: July 7, 2014, PSOF ¶ 8, and June 7, 2014, *id.* ¶ 10. Both the Amended Complaint and Defendant's Statement of Facts state Sterlinski was demoted on June 7, Am. Compl. (Count 1 ¶ 12); R. 43, DSOF at 1, so the Court adopts this date for the purposes of this Opinion.

[5]In the Amended Complaint, Sterlinski alleged that he was fired in December 2014. Am. Comp. (Count 1 ¶ 18). But Sterlinski now says that, based on discovery, his true last day of work was February 1, 2015. Pl.'s Resp. and Cross-Mot. Summ. J. at 4 n.2. Sterlinski provides no factual support for the later date, but ultimately the termination date is unimportant.

3

At this stage of the case, the key dispute is the importance of music—and, more specifically, the importance of instrumentalists—to Catholic Worship at Mass. In support of its contention that music serves a ministerial function during Mass, the Catholic Bishop relies on two sources: (1) the expert affidavit of D. Todd Williamson, the Director of the Office for Divine Worship, Archdiocese of Chicago; and (2) a document issued by the United States Conference of Catholic Bishops, entitled *Sing to the Lord, Music in Divine Worship*, which provides guidance and direction in all matters of Liturgical Music. DSOF ¶¶ 10-28. The Catholic Bishop argues that music and singing are integral elements of Catholic Worship, and that when music is played and sung at Mass, it becomes "sung prayer," that is, "prayer that is supported and directed by instrumental music being played." DSOF ¶ 14. According to the Catholic Bishop, all musicians at Mass—including the organist—"exercise a genuine liturgical ministry" by leading and sustaining the assembly's sung prayer. *Id.* ¶¶ 21-22. Of the instruments used during Mass, "the organ is accorded pride of place." *Id.* ¶ 26.

Against this, Sterlinski asserts that instrumental music, including organ music, is not necessary to a Catholic Mass or Worship. Pl.'s Resp. DSOF ¶¶ 13-14, 16, 21-28; PSOF ¶¶ 18, 34. As an organist with no discretion in what music was played or how he played it, Sterlinski contends that his role was neither necessary nor ministerial—and in fact could be replaced with recorded music. PSOF ¶¶ 18-19, 24, 26-29, 32, 34.

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Ministerial Exception

The First Amendment's religion clauses dictate that there is a ministerial exception to employment discrimination laws, namely, that "ministers" cannot

pursue employment claims against their religious-institution employers. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012) (applying ministerial exception to Title VII claim); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1041 (7th Cir. 2006) (applying ministerial exception to ADEA claim).[6] The purpose of the exception is to ensure "that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Hosanna-Tabor*, 565 U.S. at 194-95 (cleaned up).[7]

Naturally, the exception's applicability depends on whether the plaintiff-employee qualifies as a "minister." *Hosanna-Tabor*, 565 U.S. at 190; *see also Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 703 (7th Cir. 2003). For the purposes of the ministerial exception, a "minister" can be someone other than "the head of a religious congregation." *Hosanna-Tabor*, 565 U.S. at 190. In fact, there is no "rigid formula for deciding when an employee qualifies as a minister." *Id.* Rather, to determine whether a plaintiff qualifies as a minister, courts must engage in "a fact-intensive analysis," *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 657

---

[6]It is true that *Tomic* was abrogated by the Supreme Court's decision in *Hosanna-Tabor*, but only on *alternative* grounds—namely, whether the ministerial exception is jurisdictional in nature. The Seventh Circuit concluded that it was, *Tomic*, 442 F.3d at 1038-39, but the Supreme Court disagreed, concluding instead that the exception operated as an affirmative defense, not as a jurisdictional bar, *Hosanna-Tabor*, 565 U.S. at 195 n.4. *Hosanna-Tabor* did not undermine the relevant aspects of the Seventh Circuit's decision in *Tomic*. In *Hosanna-Tabor*, the Supreme Court did narrow the focus of the ministerial exception's analysis to the employee's title, training, and role (and other similar factors), but that was already much of what *Tomic* relied on in its analysis. As a result, *Tomic*'s discussion on the religious nature of a music director's duties remains both persuasive and on-point.

[7]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(7th Cir. 2018), considering factors including, but not limited to, the plaintiff's job duties, and whether they "reflected a role in conveying the Church's message and carrying out its mission"; "the formal title given [to the plaintiff] by the Church"; "the substance reflected in that title"; whether the plaintiff held himself out as a minister; and whether the plaintiff performed "important religious functions … for the Church," *Hosanna-Tabor*, 565 U.S. at 192; *see also Grussgott*, 882 F.3d at 659-661 (holding that, although employee's job title was "grade school teacher," the exception applied because she taught the Jewish religion to students); *Tomic*, 442 F.3d at 1040-41 (holding that exception applied to director of music because he selected music to be played at Mass and played the chosen music, thus performing religiously significant tasks). As discussed below, the key factor is the role of music in the Church's religious services, so the Court will tackle that issue first, and then address the secondary considerations (that is, Sterlinski's formal job title and how he was held out to others).

### B. The Role of Music in Religious Services

The Court previously held that, when Sterlinski served as the Director of Music, he performed ministerial functions within the meaning of the ministerial exception. 8/23/16 Opinion at 7-13. So claims arising from the time that he held that role were barred. *Id.* Now the only question is whether Sterlinski's post-demotion claims too are barred by the ministerial exception. The parties agree that after his demotion, Sterlinski played the organ and accompanied the Parish choir during Saturday and Sunday weekend Mass, and played the organ at Parish weddings and

7

funerals. Pl.'s Resp. DSOF ¶ 6. He did so at the direction of Father Anthony Dziorek, the Parish Pastor. *Id.* ¶ 8. The Catholic Bishop does not argue that Sterlinski retained his pre-demotion Director of Music duties, aside from playing the organ. Def.'s Resp. PSOF ¶ 13. Instead, the Catholic Bishop argues that the evidence indisputably proves that playing the organ in support of the Church's religious services still qualifies as performing a ministerial function. Def.'s Mot. Summ. J. at 8-9.

Based on the record evidence, the Court must agree. To start, there is only so much that a federal court may do in questioning a church's view of its own religious doctrine. It is true that, although "a secular court may not take sides on issues of religious doctrine, it must be allowed to decide whether a party is correct in arguing that there is an authoritative church ruling on an issue, a ruling that removes the issue from the jurisdiction of that court." *McCarthy v. Fuller*, 714 F.3d 971, 975-76 (7th Cir. 2013) (cleaned up). But "once the court has satisfied itself that the authorized religious body has resolved the issue, the court may not question the resolution." *Id.* at 976; *Grussgott*, 882 F.3d at 660 (a court should defer to a religious organization's designation of what constitutes religious activity "where there is no sign of subterfuge").

Here, the Catholic Bishop presented an affidavit from D. Todd Williamson, who has been the Director of the Office for Divine Worship for the Archdiocese of Chicago for sixteen years.[8] R. 43-5, Williamson Report at 1. The Office of Divine Worship

---

[8]Both sides critiqued the other side's affidavits as "self-serving." Pl.'s Resp. and Cross-Mot. Summ. J. at 5-6; Def.'s Mot. Summ. J. at 11. The Seventh Circuit has held that "the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724

8

implements the vision of the *Constitution of the Sacred Liturgy*, the guiding document from the Second Vatican Council (1962-1965), which addressed the Liturgical Life of the Catholic Church around the world. *Id.* Williamson obtained a Master's degree in Theological Studies with a concentration in Liturgy from Catholic Theological Union. *Id.*, Exh. A, Williamson Curriculum Vitae. He has written books and articles related to Liturgy, and speaks and presents nationally on the subject. *Id.* Based on his education, training, and experience, as well as official Church documents discussed below, Williamson opined that "[m]usic and singing are an integral element of Catholic Worship," and that "[w]hen music is played and sung at Mass it is never 'simply music'—it is sung prayer, or it is prayer that is *supported and directed by instrumental music being played*." *Id.* at 2 (emphasis added). In light of music's role at Mass, Williamson's opinion is that an organist who plays at Mass is a "minister" who "serves the Mass and all who are praying it." Williamson Report at 3-5.

This opinion relies in substantial part on *Sing to the Lord*, the United States Conference of Catholic Bishop's official document on Liturgical Music. R. 43-5, Exh. B. *Sing to the Lord* declares that "music is to serve the needs of the Liturgy." *Id.* ¶ 125. The Conference specifically pronounces that "all pastoral musicians— professional or volunteer, full-time or part-time, director or choir member, cantor or instrumentalist—exercise a genuine liturgical ministry." *Id.* ¶ 50. These musicians

---

F.3d 965, 967 (7th Cir. 2013); *see also Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017) ("*Everything* a litigant says in support of a claim is self-serving, whether the statement comes in a complaint, an affidavit, a deposition, or a trial. Yet self-serving statements are not necessarily false; they may be put to the test before being accepted, but they cannot be ignored.").

9

"serve the Church at prayer" and "are ministers who share the faith, serve the community, and express the love of God and neighbor through music." *Id.* ¶ 49. They are "a valued and integral part of the overall pastoral ministry of the parish." *Id.* ¶ 52. Even more specifically, the Conference emphasizes the importance of the organ in worship: "[a]mong all other instruments which are suitable for divine worship, the organ is 'accorded pride of place' because of its capacity to sustain the singing of a large gathered assembly, due to both its size and its ability to give 'resonance to the fullness of human sentiments, from joy to sadness, from praise to lamentation.' [The organ] 'in some way[s] remind[s] us of the immensity and the magnificence of God.'" *Id.* ¶ 87.

To be sure, simply because *Sing to the Lord* labels musicians at Mass as "ministers" does not in itself end the analysis on the ministerial exception. But *Sing to the Lord* goes well beyond a mere label. It emphasizes musicians' important role in leading and sustaining the assembly's singing, and by doing so, they "share the faith, serve the community, and express the love of God and neighbor through music." *Sing to the Lord* ¶¶ 41, 49. Together, *Sing to the Lord* and the expert opinion of Williamson establish the Church's legitimate belief that Church musicians, and even more specifically and emphatically the organist, play a religiously significant role at Mass and convey the Church's message to congregants. *See Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 177, 177 n.5 (5th Cir. 2012) (relying in part on *Sing to the Lord* and affidavits from the Director of the Office of Worship of the Diocese of Austin and an ordained Catholic priest and expert on Canon law to hold that the plaintiff

"furthered the mission of the church and helped convey its message to the congregants" by playing piano during Mass). Based on this evidence, no reasonable trier of fact could find that the Church's belief is not genuine. *See Grussgott*, 882 F.3d at 660.[9]

It is true that Sterlinski offers himself as an expert on music in Church services, and of course he opines that music does not play a significant religious role. Perhaps in another type of case or another context Sterlinksi would indeed be qualified under Federal Rule of Evidence 702 to offer an expert opinion on the topic. After all, he has played the organ for around five decades at four parishes, and he held the Director of Music position for 22 years. R. 57-1, Exh. A, Sterlinski Curriculum Vitae. But in *this* case, where a church has genuinely offered its official word on the religious significance of music, Sterlinski's opinion cannot overcome that official pronouncement. *See Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 718 (1976) (a court should not evaluate conflicting testimony in the face of an official Church doctrine).

With the official Church doctrine established, the Court must conclude that Sterlinski performed a ministerial function by performing organ music at worship and ritual ceremonies, and took part in conveying the Church's message to

---

[9]Sterlinski relies on Father Dziorek's concession that he was not aware of a specific Canon law on music. Pl.'s Resp. and Cross-Mot. Summ. J. at 12; PSOF ¶ 23 (citing R. 57-5, Exh. E, Dziorek Dep. 55:14-24). But that Father Dziorek could not point to a particular Canon law under which an organist is considered an important part of Mass does not negate the authoritative evidence comprised of *Sing to the Lord* and Williamson's expert opinion. When a good-faith, authoritative church doctrine is offered, the First Amendment's religion clauses prohibit courts from deciding otherwise. *McCarthy*, 714 F.3d at 976.

11

congregants. *See* DSOF ¶¶ 13, 16, 18 (citing Williamson Report at 2-5; *Sing to the Lord* ¶ 125). Against the official doctrine, Sterlinski resists by making two points: (1) he did not participate in picking the music; and (2) as an organist, he only "robotically played notes from sheet music." Pl.'s Resp. and Cross-Mot. Summ. J. at 7-8. On the first point, case precedent simply does not support the proposition that a lack of authority to pick the music renders a musician outside the ministerial exception. *See Tomic*, 442 F.3d at 1041 (Tomic's role as music director was ministerial even though the "rector or bishop could override Tomic's choices of what music to play"); *Grussgott*, 882 F.3d at 660 ("But whether Grussgott had discretion in planning her lessons is irrelevant; it is sufficient that the school clearly intended her role to be connected to the school's Jewish mission."); *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 803 (4th Cir. 2000) (even though the plaintiff was answerable to the Cathedral's Rector, who had the ultimate say over the music to be played at worship, the plaintiff played a major role in the presentation of music to the congregation and "there is no requirement that an individual have the 'final say' on spiritual matters before the ministerial exception can be applied."). And Williamson's expert opinion, espoused on behalf of the Church, makes the same point: a musician playing an assigned piece of music is akin to "ministering in service of the Liturgy as the Lector who proclaims the readings that are *assigned* by the Church for that particular Sunday, even though he or she did not choose the Scripture that is read." Williamson Report at 5.

On the second point, Sterlinski's view of "robotic" music performance cannot overcome official Church doctrine. *Sing to the Lord* declares that *all* musicians who play during Mass perform a liturgical ministry. DSOF ¶¶ 13, 16, 21-23 (citing Williamson Report at 2-5; *Sing to the Lord* ¶¶ 49-50) ("*all* pastoral musicians … exercise a genuine liturgical ministry") (emphasis added). As discussed earlier, federal courts have no discretion to impeach the Church's official doctrine on the ministerial significance of music. *See Cannata*, 700 F.3d at 179. It is true that *Sing to the Lord* advocates for improvisation where the musician has enough talent and training to do that, but the official doctrine does not mandate it. *Sing to the Lord* ¶ 43 ("Those with the requisite talent and training should be encouraged to continue the musical tradition of improvisation. … When worthy improvisation is not possible, it is recommended that musicians play quality published literature."). So an accompanist who does nothing more than play the sheet music still performs a ministerial function. In *Cannata v. Catholic Diocese of Austin*, the Fifth Circuit arrived at a similar conclusion. The music director in that case did perform many duties, 700 F.3d at 178 (plaintiff selected music, trained cantors, and led the choir), but the Fifth Circuit emphasized that testimony from two Church experts, as well as the text of *Sing to the Lord*, provided sufficient evidence of the importance of music to the celebration of Mass *even if* the plaintiff "was 'merely' an accompanist," *id.* at 180. Even just as an accompanist, the plaintiff "furthered the mission of the church

13

and helped convey its message to the congregants," and so the ministerial exception applied. *Id.* at 177, 180.[10]

To undermine that conclusion, Sterlinski cites to *Tomic*, in which the Seventh Circuit discussed the importance of *how* music is played during religious services. Pl.'s Resp. and Cross-Mot. Summ. J. at 9 (citing *Tomic*, 442 F.3d at 1040). That is true. *Tomic*, 442 F.3d at 1040 ("The implication is that it is a matter of indifference to the Church and its flock whether the words of the Gospel are set to Handel's *Messiah* or to 'Three Blind Mice.' That is obviously false."). But *Tomic* did *not* go on to hold that an accompanist who plays strictly from the sheet music performs no ministerial function. All that *Tomic* was saying was that it is possible to play music in a way that alters the religious experience. *See id.* The Seventh Circuit did not address the mere-accompanist issue presented by this case. What does control is the established Church doctrine that musicians do play a ministerial role in religious services.

To de-emphasize an organist's role in religious services, Sterlinski argues that it is the cantor, rather than the organist, who leads the congregation in song. Pl.'s Resp. and Cross-Mot. Summ. J. at 6. But *Sing to the Lord* several times discusses the

---

[10]The Catholic Bishop cites other cases that discuss the importance of music to worship at Mass and then conclude that the ministerial exception applies to musicians. Def.'s Mot. Summ. J. at 7-8. But in each of those cases, the actual holding did rely too on duties beyond just playing an instrument at Mass. *See Tomic*, 442 F.3d at 1040-41 (holding that because the plaintiff selected the music to be played and played that music at Mass, he performed "traditionally ecclesiastical or religious" tasks); *E.E.O.C. v. Roman Catholic Diocese*, 213 F.3d at 802 (relying on, among other things, musician's responsibility for the school's music program, assistance in music preparation for school liturgies, and piano playing at Mass).

organist's role in leading the choir and assembly. *Sing to the Lord* ¶ 31 (the choir "sings on its own or under the leadership of the organ"); ¶ 41 ("The primary role of the organist … is to *lead* and sustain the singing of the assembly and of the choir.") (emphasis added). Yes, *Sing to the Lord* also affirms that the cantor is "a leader of congregational song." *Id.* ¶ 37. But that simply means that the Conference envisioned more that there can be more than one leader of song at Mass, each of whom exercises a ministry especially cherished by the Church. DSOF ¶ 21 (citing *Sing to the Lord* ¶ 50 ("all pastoral musicians … cantor or instrumentalist … exercise a genuine liturgical ministry")); Williamson Report at 5 ("[A]ny person who leads … music *serves the Mass and all who are praying it*.") (emphasis in original). So there is no suggestion in Church doctrine, and certainly no rule of law, *Hosanna-Tabor*, 565 U.S. at 198-99 (Alito, J., concurring), stating that only one person's role qualifies as ministerial when it comes to a religious service.

Sterlinski's final point is that organ music is not required at Mass, so how could the organist serve a ministerial function? It is true that, as the Catholic Bishop admits, Mass can be held without instrumental music, and that recorded music is not forbidden. Def.'s Resp. PSOF ¶¶ 18-19, 34. But it is broken logic to then infer, from that premise, that when music *is* played live, the musician plays no ministerial function. Again, official church doctrine establishes that music conveys a religious message, and instrumentalists who play it are important ministers of the faith. DSOF ¶¶ 13, 20-23 (citing Williamson Report at 2-4; *Sing to the Lord* ¶¶ 49-50, 95) ("Music is so integral to Catholic Worship … [that] there is a great difference between simply

15

playing recorded music that the congregation would sing along with, and having a *living person* fill the *ministerial role* of physically *playing music* to support and aid the community's sung prayer.") (emphasis in original).

### C. Other Factors

As noted earlier, the key analytical factor is the official Church doctrine on the importance of a musician's role as a minister. There are, however, a couple of other factors to weigh. Starting with Sterlinski's official title, there appears to be a genuine issue of fact as to his title after his demotion. The Catholic Bishop argues that Sterlinski retained his title of Director of Music, as evidenced by the job description. Def.'s Mot. Summ. J. at 2, 9; DSOF ¶ 5; R. 43-1, Position Description (listing Sterlinski's part-time position as that of "Music Director"). Sterlinski points to the Church bulletin to argue that his new title was "organist." Pl.'s Resp. and Cross-Mot. Summ. J. at 10-11; PSOF ¶ 15; R. 57-3, Exh. C, Church Bulletin (listing Sterlinski as the "Organist"). But even accepting Sterlinski's version, the title "Organist" still points to a ministerial role under official Church doctrine, as taught by *Sing to the Lord* and as proven by Williamson's expert opinion. DSOF ¶¶ 22-23, 25-26 (citing Williamson Report at 3-4; *Sing to the Lord* ¶¶ 42, 49, 87) ("Among all other instruments which are suitable for divine worship, the organ is 'accorded pride of place.'").

The same is true as to the substance reflected in Sterlinski's title and how he held himself out to the congregation. Sterlinski concedes that he played the organ and accompanied the Parish choir at weekend Mass, and played the organ at Parish

16

weddings and funerals, and did so at the direction of Father Dzioerk. Pl.'s Resp. DSOF ¶¶ 6, 8. And Sterlinski agrees he was listed as the Parish organist on the Church's bulletin. *Id.* ¶ 9. Sterlinski's presence and musical performance at Mass alone, under the direction of Father Dziorek, demonstrated to the congregation that he, as the organist, was a messenger of the Catholic faith and a musical minister of the liturgical prayer.[11] DSOF ¶¶ 13, 20-23 (citing Williamson Report at 2-4; *Sing to the Lord* ¶¶ 49-50, 95). What's more, Sterlinski underwent substantial training to become an accomplished Parish organist. PSOF ¶¶ 1-5; *see Grussgott*, 882 F.3d at 659 (significant training pointed to a ministerial role). Finally, by listing him as the organist on the Parish bulletin, the Church further notified the congregation that Sterlinski was part of, and played an important role in, the weekend Mass, which is the primary experience of prayer for Catholics. Pl.'s Resp. DSOF ¶¶ 9-10 (citing Parish Bulletin; Williamson Report at 1).

Finally, that Sterlinski was not ordained is not a determining factor to whether he falls within the exception. *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring) ("[T]he concept of ordination" should not be "viewed as central to the important issue of religious autonomy"); *Alicea-Hernandez*, 320 F.3d at 703 ("In determining whether an employee is considered a minister for the purposes of applying this exception, we do not look to ordination but instead to the function of the position."); *Young v. N. Ill.*

---

[11]*Sing to the Lord* even specifies the placement of musicians during Mass "to enable proper interaction with the liturgical action." DSOF ¶ 20 (citing Williamson Report at 3-4; *Sing to the Lord* ¶ 95). But neither party provides facts about where Sterlinski or the organ was located during Mass, so there is no record evidence on that particular point. That said, Sterlinski had to sit at the organ to play it, so the congregation was on notice that he was the organist during Mass and at other religious functions.

17

*Conf. of United Methodist Church*, 21 F.3d 184, 186 (7th Cir. 1994) (same); *E.E.O.C. v. Roman Catholic Diocese*, 213 F.3d at 801 ("[W]e have expressly rejected any view that ordination is a prerequisite to the application of the exception."). As detailed earlier, genuinely offered official Church doctrine establishes the ministerial role of musicians, even absent ordination. The ministerial exception applies.

## IV. Conclusion

For the reasons discussed, the Catholic Bishop's motion for summary judgment is granted and Sterlinski's cross-motion is denied. The ministerial exception applies and Sterlinski's suit cannot proceed.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: July 23, 2018